Good morning. Ted Barg for the appellants, the Cox's. Despite his finding that both federal law and state law required the state to provide for safety of the children, despite the undisputed fact that the state did not provide that safety, and despite the fact that the district court found that under both federal and state law, the question of whether or not they provided the safety was a question of reasonableness, the district court nevertheless dismissed all of the claims in this case. In doing so, the district court erred in granting absolute immunity, it erred in granting qualified immunity, and it construed facts and, frankly, assumed facts, which were not in the record, construing certain facts against the non-moving party. For all of these reasons, on this de novo review, we are asking this court to correct those issues, to return this case to the district court for adjudication the way that it should occur, with the jurors deciding whether or not the safety that was provided to these boys was reasonable under the circumstances. The district court, as I mentioned, correctly noted that it's well established that a child within the care of the state is owed a due process fundamental right to safety. That's been established since 1992, at least in the Lipscomb case. The Tomas case, decided by this course in 2010, only cemented that, years before the events of this case, that the state owes a duty of reasonable care to the children. But, counsel, it seemed to me that the briefing got into some crosstalk. There's a complaint that includes a negligence claim and then three different theories of negligence, one of which had to do with a possible report of abuse, but the other two did not. Is that a fair characterization? No, I don't believe so. Are we talking about the state law claims, Your Honor? Yes. The state law claims the allegations were these, that there's a clearly established duty under state law to provide for safe protection of the children. Yes, counsel, and that's what I'm trying to get you to focus on. The negligence claim is very broad. It's not limited to reports of abuse, negligently investigating reports of abuse. No, Your Honor, certainly not. Right, and so it seems to me that that was the genesis of some of the problem in the briefing. Well, I'll jump right to that then, Your Honor. The key to this case really is that the state has repeatedly, case after case, year after year, has come before this court and the courts of Washington State,  We don't owe a duty. The only duty we owe is under the statute 2644, which requires merely that we act reasonably in placement decisions or removal decisions. The state has made that claim for years, and the state courts of Washington have shot it down time after time after time, as has this court. The foundation of our state tort claims lie in two areas. One, a special relationship existed. This has been the law of Washington for a long time. It applies to children who are in school. It applies to youths who are under the care of the church. It applies to people in mental institutions. It applies to people in nursing homes. It applies to folks who are disabled and are under the care or entrustment of the state. But as you said, they're appealing because the court did find a duty. So if we agree with you on all of this and agree that there was a duty owed to the boys, then what? Well, the court did find that there was a duty, Your Honor. Where the court erred is finding that the judge's order was a superseding, intervening cause, which relieved the defendants in this case of their obligation to provide safety. And the court erred in that on a number of fronts. Number one, the court assumed without evidence in the record that Judge Nelson had as much information as the law enforcement officers who were warning the social workers that they had concerns about the safety of the boys, that Judge Nelson had as much information as the Cox's who had known Josh Powell for years, as his own sister who obviously had known him for many, many years. The court assumed that the judge knew that visitations were regularly occurring at the Powell house when the record does not support that. Whenever you look through a brief and you see statements of fact, without citations to the record, it's a red flag. And if you go back and look at those statements that the state has made about what Judge Nelson knew about the actual supervision, I'm sorry, visitation location, you will find that there is one statement in the record, buried within a 22-page, size 10 font, single-space report by Dr. Manley, that there was one visit to the house where the social worker was there, where the GAL was there, and where Manley was there. The colloquy before Judge Nelson on the February 1st hearing did not include a statement that visitations were going on at the Powell house. But the state court judge required that those visitations continue. After all, this person was a natural father and he hadn't been charged, and it had been well over two years, going on three years, since their mother's disappearance, right? Yes, Your Honor. And required they be supervised, certainly recognized that there was a danger, there was a concern, the question was, now what, right? Yes. The first psychological report had come back and had given a relatively clean bill of health, I would say, was accepted that way. The second, of course, much more concerning. So the judge required that the visitations be supervised, and no one is second-guessing that. Why did the district court err, or would it be err, to assume that the location wouldn't have made the difference, given that the visitations were supervised? Well, Your Honor, the visitation piece of this was always within the social worker's discretion. Yes. There is nothing in the record that suggests Judge Nelson ever changed that. Their duty under state law was to make sure that those visitations were reasonable. Their own policies required that in supervised visitations, they either occur at a secure DSHS facility or at a facility that has been approved for its safety for the children. That latter never occurred in this case. So under the circumstances, the judge assumed that the court was saying to the social workers, it's okay for you to have this at Josh's house, despite the fact that the court had never been informed that there had not been a safety check at the location, despite the fact that... But neither is there an allegation that a safety check would have revealed that this father had this horrendous intent. Your Honor, it's undisputed in this case that the visitations did start by the social worker's direction at a secure facility. It's also undisputed that the only... Yes, but counsel, you're missing the point, and your time is ticking.  Have there been a safety inspection of the physical home that he was renting? Is it your contention that something would have been revealed that would have allowed the social workers to think that this horrible event could occur? Your Honor, this is a matter for the jurors to decide. Yes, it may have. It may have been that the social workers got there and found that the GAL's statement about the home appearing to be staged would have come to them and said, you know, it does look like this home is staged. There are potentially weapons in the home. It would be simple for him to grab the kids and run or get the kids locked into a part of the house. There had been some, even with the earlier visitations, there had been some problems, if you will. One of them that I noticed was, as would be understandable, these young kids would frequently bolt out of the car and run into wherever the visitation had occurred, correct? That's correct. And that was not told to the family law judge, correct? No, Your Honor, nor was the family law judge informed that Josh Powell was repeatedly violating her order about not ranting about the Cox's, about leaving the Mormons out of it, about not talking about the ongoing litigation. All of these things that the court had said in the original visitation order, it was very, no, I'm sorry, the court said it was extremely concerned about. The social workers simply did not provide the court that information. That's at the heart, let me get back to your question, if I may, very quickly, Your Honor. That is at the heart of the HBH case and the CL case. The question is, could a jury have found that if they had done things the way they were supposed to, if they had had a supervisor who was actually capable of intervening as opposed to the one that was there, if they had actually checked to make sure that it was a safe location, could a jury conclude that they're liable? And under HBH, I think the answer is clearly yes, the jurors could. Counsel, could you go to the 1983 claim? Absolutely. What I'm interested in is not so much the discussion of immunity, but what your strongest argument is for deliberate indifference. Well, there's no question that the social workers knew of an objective risk. Nothing had changed since these boys were taken into custody. Absolutely nothing had changed. There was still a question as to whether or not Josh Powell was involved in the pornography and voyeurism at Steve Powell's house. In fact, everything had gotten worse because after that, the social workers came to understand that the West Valley police had secured these incestual pornographic images off of Josh's computer showing parents and their children engaged in really horrific sexual activity. That was brought to the court. That amendment came to the court, I think, on January 31, and the hearing was February 1, so the next day. That's right. And the court was clearly concerned and ordered additional testing. So my question goes to how did the state demonstrate deliberate indifference there? Or perhaps that's not part of your argument, but my question is what's the strongest showing of deliberate indifference? Absolutely. So what is their obligation? Under the Ammon case, this court said you can't simply sit back and do nothing when you see risk. So what did they know? They know the boys had been telling their grandparents that they liked to sleep in the nude and that they had done that with their dad. Then you get incestuous porn from Utah. That's a big problem. They know, they believe that Josh Powell has already killed one family member. That means there's a risk out there. Attorney Long, in the placement dependency hearing, specifically said it was the worst abuse you could impart upon a person outside of doing it to them. In addition, there was no DV assessment undertaken by the social workers, despite that being their own policy, despite the fact that they knew that there had, that they believed there had been substantial DV within the home, despite their own policy saying that a DV assessment needs to be done at every step of the proceeding. What did they do? They didn't investigate at all. Rocky Stevenson, the CPS investigator, closed his file as unfounded before Manley's report came back, before he'd seen any of the information from Utah. The first report or the second? The first report. Thank you. There was no supervisor check. In other words, Griffith Hall, who under DSHS's own guidelines, was supposed to be somebody who was trained to make sure that they understood what they were doing. Griffith Hall had never done a home visitation before. She had only done visitations at secure facilities. Their own policies required the person to be able to intervene for the safety of the children. Griffith Hall was 65 years old. I don't have anything against 65-year-old people, but when you've got a 65-year-old female or male, for that matter, versus a 35-year-old dad in a circumstance where they're isolated and the father has ample opportunity to secret the kids or lock you out or do things, that is not somebody who can intervene for the kids. So the question is, was there – The question is whether anyone could have intervened for these children. This is a heart-wrenching case. It is a heart-wrenching case, Your Honor. And in retrospect, and that's always the rub, is the retrospective view, was there ever any motion filed in this case arguing that his criminal conduct was a superseding intervening cause? No, Your Honor. So I'm going to reserve a little bit of my time, but I do want to finish up with your question about deliberate indifference. There was a sea of known objective risk from law enforcement, from the Coxes, from his sister, from the pornography. All of the risks were a risk from Josh Powell to his kids. Those risks did not diminish through the course of the dependency up until the day that he slaughtered those boys. A jury needs to be able to determine whether, in the face of all of those risks, the state was deliberately indifferent in not moving visitation back to a secure facility and not assuring that you had a supervisor there who could intervene. These are jury issues. I'll reserve the remainder of my time. Thank you. Thank you, Counsel. Good morning, Your Honor. This may please the Court. Peter Hellenberg on behalf of the defendants. The social workers were obligated for carrying out the courts. Before we get into that, I have a question directed at you. Okay. We issued an argument order asking counsel to address, and your opponent did, some recent cases that deal with the duty of the state, correct? Correct. Correct. And you've obviously read those decisions. In fact, in the HPH case, you were counsel for the state that argued that case, right? Correct. Why didn't you file a supplemental citation with this court? Regarding the HPH? Yeah. Well, it's pending before the state Supreme Court, and it's not ‑‑ You don't think you have an ethical obligation to tell this court when there's published opinions of Washington State Court going absolutely against your position? I don't believe that HPH goes absolutely against the state's position. Okay. Let's say that it simply shines light on the duty of care owed children in this circumstance. You think you have no obligation to tell this court about that? Your Honor, my office ‑‑ Why didn't we have to dig it out? Your Honor, my office had this case. We've got numerous appellate attorneys and ethical attorneys that are all part of the panel that we, and for some reason it was not considered supplemental authority that was pertinent to this case. To the underlying facts of this case, to the underlying law governing this case, HPH doesn't govern the law of this case, either for the state claims, let alone the federal claims. You know, we were usually pretty flexible when counsel missed cases, or in this circumstance where the briefing ended before the decisions came out, and sometimes lawyers come in and tell us that they weren't aware of the decision. You argued the case in front of the Washington Court of Appeals. Correct. And you didn't feel it was necessary to tell us about it? It doesn't apply to this case. The HPH ‑‑ I understand you have an argument about whether it does or does not apply. We thought, after our research, it applied to the facts of this case, whether you can distinguish it or not. But you have a personal ethical obligation to tell the court about opinions, written opinions that bear on the issues before the court. My apologies. Do you understand my concern? I do. Okay. Go ahead with your argument. The social workers were obligated to carry out the February 1, 2012 order, which required that the supervised visitations continue and remain as is at the Powell residence. No, it didn't say at the Powell residence. Remain as is is probably taken at the Powell residence. The Guardian letter report, which is at ER 27. Counsel, those visitations were supervised, right? Correct. Is it really going to be the State's argument that the social worker didn't have discretion while she's acting in a capacity as a monitor, a supervisor of visitation? She had to go forward? If she thought the boys were in danger, she couldn't have stopped the visits? If she thought the boys were in danger, she could have stopped the visit. Well, that's a discretionary function by definition, Counsel. The two points. First, it was known to Judge Nelson, and the Guardian letter report made it very clear that the visits were occurring at the Powell residence and had been since November. That's not the answer to my question. So the second point is then what obligation or authority would be imposed on the social workers through either the Constitution or State law to require them to deviate from the court's order that visitation? Permit her to deviate. She had a discretionary function. She had the discretion to deviate. Okay, so if we want to explore this under 1983, there is the discretion, assuming there is the discretion to deviate from the court's order after February 1st, that discretionary decision is protected by qualified immunity unless there's a clearly established Counsel, you are not answering my question. Okay. Is it really the State's position that there was not sufficient discretion in that social worker's job description, we'll say it loosely, to deviate? Is it really your argument that she was obligated to have those visits at the father's rented home? Our answer to the question is that the court order did obligate at the father's home, but even assuming that the social worker did have the discretion. Let's just say that you absolutely lose on this assertion that the court had ordered the visitations to go forward in father's home because of my scorecard, you do. Okay. The court never addressed the location of those visitations. But what I'm much more interested in is whether or not you are defending the ruling in the district court that the social worker didn't have discretion to deviate. If the social worker did, okay, so assuming the social worker had discretion to deviate, that decision is protected in the 1983 analysis because it's a discretionary decision, which doesn't violate a clearly established constitutional right. And as far as the state law, there is not a state law application which would apply to whether or not the social worker would or would not exercise that discretion. So let's talk about 1983. The discretion whether or not to deviate from the court's order or how to implement the court's order from February 1st is protected unless there's a constitutional right which directs that essentially every social worker would know that failing to deviate from the courts or from the plan that was in place violated a clearly established constitutional right. The burden was on the plaintiffs to provide the contours of the right and outline that failing to alter the visitation plan that had been in place since November was violating that constitutional right. And there simply has not been any case law put before either of these courts which demonstrate that that decision was violating that constitutional right. The plaintiffs relied on the Tomas decision, which is distinguishable from the case at hand, for any number of reasons. The Tomas decision had numerous CPS referrals alleging abuse and neglect, over 20 CPS referrals. Here there was never any allegation of abuse or neglect that Joshua Paul had physically harmed his children. That's probably because there was a whole range of information that was not given to the family court judge here in Washington, right? She was not told, the family law court was not told, that Joshua Paul's own sister feared for the safety of these children in the presence of her brother. Is that correct? That's correct. The juvenile court did have, and there's two points that I'd like to make in response to this, the juvenile court did have in front of it the criminal file from the Pierce County Superior Court which outlined the reasons for the probable cause and the search warrant which got the whole process started, which is not something the social workers had. So this is the same information that would provide regarding the disappearance of Susan Powell that the police officers would have and the family members might have. And from that, you're talking about hunches and information or concerns and beliefs and opinions, but not actual facts upon which. I think most of it is hunches. I think most of it is hunches, and I'll give you that. But what about some of the more specific statements? Was the family judge, I think called a dependency court judge, ever told that Josh was violating the order to not discuss the Cox's or to not disparage the Cox's? I don't find in the record that she was told at the outset that he was making these disparaging comments, but two points about that. One, if you look at the hearing from February 1st, by that point in time, those comments had essentially been abated. They were no longer part of the visitation process, and there was no safety concerns that were being reported by the visitation supervisor. You also had, the juvenile court also had the psychological evaluation, of course, of Dr. Manley and the addendum to that psychological evaluation, which was based on the syncesuous cartoon images that were delivered to the state from the state of Utah. Never through any of the psychological evaluations or through the visitation supervisor that had seen the visits in the Powell home for, at that point, three months, were there ever any reports of safety concerns regarding Mr. Powell's interactions with the children. The other component that I want to address is that when the juvenile court goes about entering an order on visitation, they're guided by RCW 1334.136.2B.2i, which codifies, if you will, the balancing test that a juvenile court and the DSHS should employ when they are balancing the parent's fundamental right to have visitations with their child, as well as the needs of the family towards reunification and safety. No, understood. I'm sorry. I may be cutting to the chase. You know, when you issue a search warrant, the judge is dependent on what the law enforcement officer provides. Correct. In order to, and we all know it's under probable cause. Okay. So the dependency court, the judge doing this, is depending on information that's provided from many sources, Dr. Manley, but most importantly from the social worker. And so the case that you, I forgot the name of it, you talked about all these allegations of abuse, that's information that's put into the hopper and then determined by the dependency judge. But that information, if it never gets to the dependency judge, for instance, not doing the safety investigation, you're saying, and I agree with you, and we searched the record, it's like in a footnote and it's also in passing in Dr. Manley's report that these visitations are being taken, are taking place now in Josh Powell's home and have been. There's no indication that the children have been running ahead of the social worker and entering the home without the social worker first, you know, being inside the home and so forth. All this information is not provided to the judge. So how can her order then be a reasoned order that's based on all of the important information? Because the body of the evidence that was before the judge at the time, Dr. Manley's report, the criminal file, the guardian letter reports, the reports from the various parties, combined with the state statute that governs and dictates that visitation shall be early and frequent and maximize contact between social workers and children in order to go... Right, but that's the law. The law. But that's the facts that are going to inform the judge in applying the law, correct? Well, right, but the facts, but given the facts that the judge did have, the district court properly ruled that adding to that hunches and beliefs regarding the dangerousness of Joshua Powell based on the same information the court had, which was the information in the criminal file, would have changed the outcome of ordering supervised visits. So we really don't have to debate about that, do we? Hasn't the dependency court judge told us what she would have done if she had been informed of all this information? I don't believe that dependency court has indicated that. Dependency court indicated in the declaration that she signed that she did review all the information that was submitted to, and she reviewed the guardian letter report. And I think the point of that is that in reviewing the guardian letter report, the juvenile court was aware that the visitations were occurring in the Powell residence. It's important to note that at the October 26th hearing, it was openly discussed in open court that the visitations were going to move towards the Powell residence and that the court signed an order which said that visitations may be expanded upon agreement of the social worker and the guardian ad litem. This is typical language in the dependency process in the State of Washington where the permanent plan is to return the children home to reunify with the parents, which was the permanent plan. Which is also exactly why this was a discretionary function, but why the social worker retained discretion. But I have another question for you, counsel. There's much made, much discussion in the briefing of the boys running ahead on many visits, I think eight or nine visits, running ahead to go into the house. And with hindsight, of course, we know there were very tragic consequences to that. But it strikes me as a two-edged sword. One indication that the boys weren't fearful of their father is that they were happy to see their father and that they were running ahead. Did the state make that argument before the district court, that the boys running ahead should not have been a cause for concern? I don't believe I made that argument when we were either in the briefing or an oral argument. I didn't. Because what it does show at the time with the social workers and the decision at the time was that they were not afraid of their father. They were anxious to see their father. That's the whole point. That's the point. And so we're now with terribly tragic hindsight, of course, looking back on it and saying, well, that was perhaps. But to anticipate because the boys were running ahead, happy to see their father and anxious for these visitations, that he was going to do what he did is impossible. But aren't they arguing not that in its isolation, but the fact that there's no security or safety inspection? So they're running ahead to see their father, and it could be interpreted as a positive for the father. But in conjunction with the fact that they're arguing, you don't do a safety evaluation of the environment. So you really only have half the equation, if that. The safety evaluation of the environment pertains to foster homes and not to, in the policies they cite, and not to a home inspection like of a biological home in the first place. In the second place, you did have a guardian ad litem that did visit the home prior to the October 26th hearing. So the guardian ad litem was out there. And then you had, of course, the visitation supervisor that was there every week for three months running, monitoring the visits. And had there been a safety concern, had the visitation supervisor thought something was wrong, that certainly would have been reported to the social worker and to the assistant attorney general, who was at the hearing on February 1st. Why didn't the state argue that the criminal conduct of the father was the intervening cause? Pardon? Why didn't the state argue that the father's criminal conduct was the intervening cause? The father's intentional conduct is the superseding intervening cause of the. . . I don't think you filed the motion. I don't think the state argued that, did it? No, we didn't file any separate motion in addition to that. Instead you relied on duty? And then also causation, because the juvenile court's order of February 1st would break any causal link between any negligence that would occur up to that point, because it is clear in the record that the juvenile court was aware that the visitations were occurring at the Powell residence, and said remain as is. Is it the state of Washington's position that under the facts and circumstances of this case there was no special relationship between the social workers and these children? Are we talking about Constitution right now or state law? State law. Yes, it's the state's position that there is no special relationship between social workers and children in dependency status. Here's what your own court of appeal said about that. Absent proper monitoring by the state, a foster child is wholly exposed to the will of the foster parents, whether that will is a blessing or a horror. In this setting, the state is the last watchman of the foster child's well-being. A more compelling illustration of the bases of a special relationship is hard to imagine. That is what they said. Yes, and that's under review. That's pending before the state Supreme Court argument will be in the middle of February. Well, this is the decision you didn't think we needed to know about. Pardon? This is the decision you thought we didn't need to know about. Your Honor, I apologize. I didn't. Is your reason for finding a distinguishable, well, what is your reason, that it pertains to foster parents as opposed to natural parents, or what is your position? On why HBH doesn't apply? Because this is a visitation with a biological parent that's governed by a completely different set of statute and a completely different body of law. Why was it supervised then? The visitations are typically supervised. In this case, I think the main reason the visitations were supervised were as part of the parenting assessment of Joshua Powell to make sure that he wasn't engaging in the disparaging comments and that sort of thing. Just the comments? There wasn't concern about him being in the presence of his children unsupervised? I don't know if it wasn't concern based on him being violent towards his children unsupervised. There had to be a finding, and there was. The box was checked that the children were at risk of danger, and that was the justification for requiring supervised visitation with the natural father, right? Correct. But it wasn't based on any reports or allegations of abuse, of physical abuse directed towards his children. We understand. Thank you. Thank you. I want to touch very briefly on the qualified immunity issue. The standard for this is reasonable care, reasonable safety for the children, which is very, very similar to the law enforcement use of force standard of reasonable force under the circumstances. There's a reason the qualified immunity is almost always inappropriate in a use of force situation. It's because the jury has to decide whether or not the force was reasonable. So, too, here. Did you say almost always inappropriate? That's right, Your Honor. Qualified immunity is granted in law enforcement cases with regard to a whole array of different kinds of claims, but almost never on force because it's a reasonable standard. We see a lot of those cases, so that's not your strongest argument. The second thing I'd like to address, folks, is the deliberate indifference standard. What else did they not know or did they know about this? Number one, Forrest Jacobson specifically said she was concerned that Josh might take the kids and flee from the scene. They knew the kids were talking about their mom. Mommy's body was found in the desert. They knew Josh Powell reacted very strongly to that. He was backed into a corner. He had just been ordered to undergo a psychosexual evaluation and a polygraph. He had failed the child. He wasn't ordered to undergo a polygraph, right? He was. Was that suggested by Dr. Manley? Did the court then order it? Yes, Your Honor. Thank you. He failed the child abuse inventory that Dr. Manley gave him because, as Manley noted in his report, he was too defensive. So the very thing that would have helped them figure out whether he was a risk was not a valid test. The CPS workers failed to even review the divorce file. The expert witnessed that the plaintiffs pulled and got an opinion. Counsel, had they reviewed it, is there something they would have found there that you think would have changed this outcome? Yes, Your Honor. I believe that they would have. They would have found that he had threatened to kill his mother with a knife when he was younger, that he had killed animals before. All classic signs of people who can snap, people who can do very violent things. None of this information ended up in front of Judge Nelson, however. The state says that Judge Nelson had the opportunity to review the same criminal files. That's simply not in the record. The search warrants were sealed. The law enforcement officers who told the social workers that they had concerns about the kids' safety, they had access to those. There's nothing in the record that shows that Judge Nelson had that. Moreover, under Judge Layton's reasoning that she had ratified it, the Babcock case from 1991 squarely does away with that. At most, what Judge Nelson did was gave them continuing discretion to ascertain where these visitations should go on. The body of evidence that the state argues ignores all of these disputed factual issues, ignores all of the information that the social workers had that they never gave to Judge Nelson. It takes away from the jurors' ability to come to the conclusion that Judge Nelson would have done something about this if she had been informed of all of these risks. This is exactly what the case law says. Counsel, you're substantially over your time. Thank you, Your Honor. Thank you. We'll stand in recess and thank both counsel for your argument. Thank you.
judges: Hawkins, Christen, Kobayashi